# Commonwealth, Appellant, *v.* One Dodge Motor Truck.
# Commonwealth, Appellant, *v.* 15 Cartons Silver Wedding Gin et al.

Argued April 14, 1936.

Before KELLER, P. J., CUNNINGHAM, BALDRIGE, STADTFELD, PARKER, JAMES and RHODES, JJ.

*J. Alfred Wilner,* Special Deputy Attorney General,

with him *Charles J. Margiotti,* Attorney General and *Horace A. Segelbaum,* Special Deputy Attorney General, for appellant.

*Milton E. Harris,* for appellee.

OPINION BY KELLER, P. J., September 30, 1936:

American Motor Lines is a partnership engaged in the transportation of freight by motor truck between Pittsburgh, Pennsylvania, and Baltimore, Maryland, Cumberland, Maryland, and Washington, D. C. In the conduct of its business the firm hired Charles A. Stambaugh to drive his Dodge motor truck for it as might be directed. Neither the partnership, nor any of its members, nor the said Stambaugh, had complied with the provisions of the Act of Assembly of this Commonwealth of December 8, 1933, Special Session of 1933-34, P. L. 57, which provides, inter alia, in section 3, that it shall be unlawful for any person (except as exempted by section 5) to manufacture, ...... or transport for hire within this Commonwealth any alcohol or alcoholic liquid without a permit from the Commonwealth obtained as provided in the Act. It is not necessary to review the provisions of the Act, beyond stating that every applicant for a permit to do any of the things forbidden in section 3, is required to file an application in writing with the Pennsylvania Liquor Control Board setting forth in detail the matters prescribed by the Act, and give bond to be approved by the board conditioned for the faithful observance of the conditions of the permit and of all the laws of the Commonwealth [1] relating to alcohol or alcoholic liquid,

[1] See particularly the Acts of November 29, 1933, Special Session of 1933-34, P. L. 13, creating the Pennsylvania Liquor Control Board; of November 29, 1933, Special Session of 1933-34, P. L. 15, as amended by Act of July 18, 1935, P. L. 1246, to regulate and restrain the sale, manufacture, possession, transportation, importation, traffic in and use of alcohol and alcoholic and malt

as defined by the Act (sec. 8), and pay a fee, as respects transporting alcohol or alcoholic liquid for hire, of one hundred dollars [2]. Nor will any good purpose be served by a recital of the other laws of this Commonwealth regulating, restraining and controlling the manufacture, sale, possession, transportation, etc. of alcoholic liquors. They may be consulted, if desired, in the Pamphlet Laws or in Purdon's Pennsylvania Statutes and its supplements. They form, taken together, the method or system adopted by this Commonwealth, after the repeal of the Eighteenth Amendment, for the regulation, restraint and control by the State, through its agency, the Pennsylvania Liquor Control Board, of the manufacture, sale, use, possession and transportation of alcoholic liquors, and constitute an exercise of the police power of the Commonwealth for the protection of the public welfare, health, peace and morals of its people: Sec. 3 (a) of Act of November 29, 1933, Special Session 1933-34, P. L. 15, and amendment of July 18, 1935, P. L. 1246.

It is not contended that American Motor Lines, or any of its partners or the said Stambaugh came within the exempting provisions of section 5 of the Act, or that they applied for a permit, gave bond and paid the prescribed fee or secured the permit required by the Act.

On or about July 24, 1935, when all of the statutes referred to in this opinion and the notes hereto were in force and effect the said American Motor Lines received from the distillery of Joseph H. Finch Company in Schenley, Pennsylvania, a shipment of gin, whiskey

---

or brewed beverages; conferring power and imposing duties upon the Pennsylvania Liquor Control Board, ...... authorizing the establishment and operation of State stores for the sale of such beverages not for consumption on the premises, etc.; and of December 8, 1933, Special Session 1933-34, P. L. 57, supra.

[2] Or, from one-fourth to three-fourths of that amount if applied for during the running of the current 'permit' year.

and brandy, contained in 39 cartons, for transportation for hire and delivery to International Distillers and Distributing Corporation, Washington, D. C., to whom it was consigned. It is admitted that the tax due on all said liquors both to the United States Government and to the Commonwealth of Pennsylvania had been paid. On the same date said American Motor Lines received at Pittsburgh from Transcontinental Carriers, Inc., a shipment of whiskey, contained in five cartons, which had been shipped from Brown Foreman Distillery Company in Louisville, Kentucky, for delivery to Puritan Beverage Company, Baltimore, Maryland, and had been transported by said Transcontinental Carriers, Inc. from Louisville, Kentucky, to Pittsburgh, Pennsylvania, and transferred in Pittsburgh to a truck of American Motor Lines for transportation to Baltimore, Maryland.

All of said 44 cartons of liquor were loaded at Pittsburgh on the Dodge truck owned and driven by Stambaugh, which had been hired by American Motor Lines, to be transported and delivered to the respective consignees. After the said truck had been loaded, but before it left Pittsburgh, it was seized with its contents, and impounded in a warehouse in Pittsburgh, by the Pittsburgh Enforcement Division of the Pennsylvania Liquor Control Board because of the failure of said American Motor Lines or Stambaugh to obtain a permit for the transportation for hire of said liquors within this Commonwealth. The Act of December 8, 1933, supra, P. L. 57 (Special Session), sec. 21, and the Act of July 18, 1935, P. L. 1246, sec. 611, both provide, in substance, that no property rights shall exist in any alcoholic liquid manufactured, possessed, transported for hire, etc. in violation of any of the provisions of said acts, and that the same shall be deemed contraband and forfeited to the Commonwealth and destroyed; and the Act of 1935, supra, makes the same declaration as to any vehicle used in the illegal trans-

portation of such liquors, but provides for proceedings for the *sale* of such vehicle by the court of quarter sessions, instead of its destruction, as in the case of the liquors themselves. The proceedings leading up to such forfeiture or condemnation and destruction or sale are set forth at length in section 611 of the Act of July 18, 1935. The validity of these provisions is not questioned in this case except as respects alcoholic liquors being transported in interstate commerce. Notice was given American Motor Lines and Charles A. Stambaugh that the liquor and truck were condemned and forfeited under the provisions of the Act of December 8, 1933, supra, section 21 and the Act of July 18, 1935, supra, section 611.

Petitions were thereupon filed in the Court of Quarter Sessions of Allegheny County by American Motor Lines [3] and Charles A. Stambaugh setting forth that they had not procured a permit for the transportation for hire of such liquors, because "the transportation of the said liquor was interstate, and the Commonwealth of Pennsylvania has no right or power to make laws affecting such commerce", and averring that the seizure and impounding of the said truck and its contents was a direct interference with their rights as citizens of the United States engaged in the transportation of freight in interstate commerce, and praying that an order be made releasing said truck and its contents. Rules to show cause were granted which, after argument, were made absolute. The Commonwealth has appealed. The question involved is whether the third section of the Act of 1933, supra, which makes it unlawful for anyone to transport alcoholic liquors, for hire, within this Commonwealth without a permit, as

---

[3] Subsequently amended by American Motor Lines, so as to include the five cartons received from Transcontinental Carriers, Inc. for transportation and delivery to Puritan Beverage Co., Baltimore, Maryland.

aforesaid, is unconstitutional as respects the transportation of the two lots of liquor above referred to, because repugnant to the commerce clause of the Constitution of the United States (Art. I, sec. 8), as affected by section 2 of the Twenty-first Amendment.

As no answer was filed on behalf of the Commonwealth, the facts set forth in the petitions must be taken as true. The petitions, however, raised no question as to the reasonableness of the provisions in the statute requiring the obtaining of a permit for the transportation for hire of alcoholic liquors within this State. They attacked only the power of the State to enact any law requiring a permit to transport alcoholic liquors in interstate commerce, as a direct interference with petitioners' rights as citizens of the United States to transport freight in interstate commerce. The reasonableness of the regulation by the State was not raised in, nor discussed by, the court below. In his brief in this court counsel for appellees has attempted to argue that the provisions of the Act are unreasonable and burdensome, but, as the case was presented in the court below, the question is not properly before us. The power of this Commonwealth to require any permit, applicable to the transportation for hire of the intoxicating liquors seized, is the question involved—not the reasonableness of the provisions of the present statute, which, for the purposes of this case cannot now and here be questioned.

At the very outset it should be stated that the statutory provision under consideration makes no discrimination against transportation of intoxicating liquors in *interstate* commerce, and in favor of transportation of such liquors in *intrastate* commerce, or wholly within the State. It is a police measure applicable alike to all transportation for hire of such liquors within this State. Hence decisions of federal courts, relied on by the appellees, such as *Joseph Triner Corp. v. Arundel,* 11 Fed. Supp. 145, and *Young's Market Co. v. State*

*Board of Equalization,* 12 Fed. Supp. 140, do not apply. In the former case the enforcement of an act of the State of Minnesota which prevented the importation of liquors containing more than 25 per cent of alcohol unless the brands imported were registered in the Patent Office of the United States was enjoined, because it discriminated between manufacturers of liquors outside of Minnesota and those within, to the prejudice of the former. In the latter case, the statute discriminated between wholesalers of beer manufactured within the State of California and those who sold beer imported into the State, with respect to the amount of tax or license paid for the privilege of selling beer, to the injury of the latter. No such discrimination is present in our statute as respects permits for the transportation for hire of alcoholic liquors.

Our action in this case must necessarily be governed largely by the decisions of the Supreme Court of the United States. But decisions of that court prior to the enactment of the Wilson Act of August 8, 1890, c. 728, 26 Stat. 313, U. S. C. A. Title 27, sec. 121 [4], are of but little help in the present case. It was the effective protest of states having laws prohibiting, generally or conditionally, the manufacture and sale of and the traffic in intoxicating liquors following the decisions of the Supreme Court in *Bowman v. Chicago & Northwestern Ry. Co.,* 125 U. S. 465, and *Leisy v. Hardin,* 135 U. S. 100, relied upon by the appellees, which led to the pas-

---

[4] "All fermented, distilled or other intoxicating liquors or liquids transported into any State or Territory or remaining therein for use, consumption, sale or storage therein, shall upon arrival in such State or Territory be subject to the operation and effect of the laws of such State or Territory enacted in the exercise of its police powers, to the same extent and in the same manner as though such liquids or liquors had been produced in such State or Territory, and shall not be exempt therefrom, by reason of being introduced therein in original packages or otherwise."

sage of the Wilson Act, supra, and later to the enactment of the broader and more comprehensive Webb-Kenyon Act of March 1, 1913, c. 90, 37 Stat. 699, U. S. C. A. Title 27, sec. 122 [5].

There is no doubt that prior to the passage of these Acts of Congress it had been decided that while, "for the purpose of protecting its people against the evils of intemperance [a state] has the right to prohibit the manufacture within its limits of intoxicating liquors; it may also prohibit all domestic commerce in them between its own inhabitants, whether the articles are introduced from other states or from foreign countries; it may punish those who sell them in violation of its laws; it may adopt any measure tending, even indirectly and remotely, to make the policy effective until it passes the line of power delegated to Congress under the constitution. It cannot, *without the consent of Congress, express or implied,* regulate commerce between its people and those of other states of the Union in order to effect its end, however desirable such a regulation might be." [6] (italics supplied).

But the very purpose of those acts was to give the

[5] "An Act divesting intoxicating liquors of their interstate character in certain cases". "Be it enacted, etc. That the shipment or transportation, in any manner or by any means whatsoever, of any spirituous, vinous, malted, fermented or other intoxicating liquor of any kind, from one State, Territory or District of the United States ...... into any other State, Territory or District of the United States ...... or from any foreign country into any State, Territory or District of the United States ...... which said spirituous, vinous, malted, fermented or other intoxicating liquor is intended, by any person interested therein, to be received, possessed, sold, or in any manner used, either in the original package or otherwise, in violation of any law of such State, Territory or District of the United States ...... is hereby prohibited."

[6] Mr. Justice MATTHEWS in *Bowman v. Chicago & N. W. Ry. Co.,* supra, p. 493; cited and approved in *Leisy v. Hardin,* supra, p. 114 (FULLER, C. J.).

consent of Congress to a limited and non-discriminatory interference by the States with the interstate transportation of intoxicating liquors into and in those States, in the enforcement of their laws enacted to prohibit, restrain or control the manufacture, sale, use and possession of intoxicating liquors, and the effect of the Webb-Kenyon Act was to prohibit the transportation in interstate commerce of all liquor intended to be received, possessed, sold *or in any manner used* in violation of any law of such State: *Clark Distilling Co. v. Western Maryland Ry. Co. et al.,* 242 U. S. 311, 321.

The constitutionality of the Wilson Act was upheld by the Supreme Court in In re *Rahrer,* 140 U. S. 545; and in *Clark Distilling Co. v. Western Maryland Ry. Co. et al.,* supra, the constitutionality of the Webb-Kenyon Law was sustained. Chief Justice WHITE, who wrote the opinion in the latter case, said that it was not open to controversy that a State could, consistently with the due process clause of the Fourteenth Amendment, forbid the manufacture and sale of liquor, and regulate its traffic, and that along with this power went full police authority to make it effective (p. 321) ; and held that as the law of the State of West Virginia under consideration had forbidden the shipment into or transportation of liquor in the State, *whether from inside or out,* and all receipt and possession of liquor so transported, without regard to the use to which the liquor was to be put, and as the Webb-Kenyon Act prohibited the transportation in interstate commerce of all liquor intended to be received, possessed, sold, *or in any manner used* in a State, either in the original package or otherwise, *in violation of any law of such state,* the prohibitions of the State law were made applicable to, and effective in, interstate commerce by the Webb-Kenyon Law.

These cases were followed by *Seaboard Air Line Ry. v. North Carolina,* 245 U. S. 298, 304, which held that

the power of a State under the Webb-Kenyon Law to forbid shipment into its territory of intoxicating liquor from other States includes the lesser power *to prescribe by law the conditions under which such shipments may be allowed;* and that as the Webb-Kenyon Law had subjected interstate shipments of intoxicating liquors to state legislation, a state law requiring carriers to keep records of such shipments open for the inspection of any officer or citizen, was valid. The opinion by Mr. Justice McREYNOLDS says, inter alia: "Since our decision in *Clark Distilling Co. v. Western Maryland Ry. Co.,* 242 U. S. 311, 320, 324, it has not been open to serious question that ...... under it [the Webb-Kenyon Law] a State may inhibit shipments therein of intoxicating liquors from another by a common carrier although intended for the consignee's personal use, when such is not actually forbidden ...... The challenged act [of North Carolina] instead of interposing an absolute bar against all such shipments, as it was within the power of the State to do, in effect permitted them upon conditions intended to secure publicity, to the end that public policy might not be set at naught by subterfuge and indirection. *The greater power includes the less."* To the same effect see *State of Kansas v. Missouri Pac. Ry. Co.,* 96 Kan. 609, 152 P. 777, affirmed in *Missouri Pac. Ry. Co. v. Kansas,* 248 U. S. 276.

The 'Reed Amendment' [7],—although not directly involved in this case—went still further, and made it a misdemeanor for anyone to transport intoxicating liquors in interstate commerce, except for scientific, sacramental, medicinal and mechanical purposes, into

[7] Act of Congress of March 3, 1917, sec. 5, c. 162, 39 Stat. 1058, 1069 (see also, Acts of March 4, 1917, c. 192, 39 Stat. 1202; February 24, 1919, c. 18, sec. 1407, 40 Stat. 1151; January 11, 1934, c. 1, Title I, sec. 12, 48 Stat. 316, U. S. C. A. Title 27, sec. 123).

any State or Territory, the laws of which prohibit the manufacture therein of intoxicating liquors for beverage purposes. It was strictly enforced in *United States v. Hill,* 248 U. S. 420, and *United States v. Simpson,* 252 U. S. 465.

This was the status of the subject when the Eighteenth Amendment to the Federal Constitution was adopted, which rendered illegal all commerce, interstate or otherwise, in the transportation of intoxicating liquors for beverage purposes. The effect of the statutes and decisions in force just prior to the adoption of the Eighteenth Amendment was to hold that the police power of each State includes the regulation of the transportation, as well as of the manufacture and sale, of all intoxicating liquors within its territory, except so far as affected by the grant, in the Constitution, to Congress of the power over interstate and foreign commerce; that under said grant Congress may consent, and, by those statutes, had manifested its consent, that intoxicating liquors should not be transported in interstate commerce in violation of the laws of the state prohibiting or regulating their manufacture, sale and transportation.

It was decided in *McCormick & Co. v. Brown,* 286 U. S. 131, 143, that the Webb-Kenyon Act had not been repealed by the Eighteenth Amendment nor by the National Prohibitory Act for its enforcement, and was still in force. That case also held that state legislation, although it could not give validity to acts prohibited by the Eighteenth Amendment, might provide additional instruments to make prohibition effective. The repeal of the Eighteenth Amendment did not affect this power of the States. The specific ruling in that case *(McCormick & Co. v. Brown)* was that sales made by non-resident wholesalers,—who did not have the wholesale permits required by West Virginia—, to retailers in West Virginia, who had local permits to sell the kind

of alcoholic products shipped, were forbidden by the Webb-Kenyon Law, since the State law did not make the local retail permits a substitute for those required of wholesalers.

The Twenty-first Amendment, which repealed the Eighteenth Amendment, provides in section 2: "The transportation or importation into any state, territory or possession of the United States for delivery or use therein of intoxicating liquors, in violation of the laws thereof, is hereby prohibited." The evident purpose of this provision was to withhold from Congress, on the repeal of the Eighteenth Amendment, the power to restore the status which existed before the passage of the Webb-Kenyon Law. As a matter of precaution, since the adoption of the Twenty-first Amendment, the Webb-Kenyon Act has been re-enacted verbatim—see Act of August 27, 1935, c. 40, sec. 202 (b), 49 Stat. 877, U. S. C. A. Title 27, sec. 122.

Following the repeal of the Eighteenth Amendment to the Federal Constitution, the Commonwealth of Pennsylvania, in the exercise of its police power, adopted an entirely new system for the regulation, restraint and control of intoxicating liquors, by the enactment of legislation governing their manufacture, possession, transportation, importation and use, and the traffic in them. It created a new State agency, the Pennsylvania Liquor Control Board, and conferred upon it the power and duty to regulate, restrain and control, by the granting of licenses and permits and the establishment of State Liquor Stores, the manufacture, possession, transportation, importation, traffic in and use of alcohol and alcoholic, malt and brewed liquors.

The statutes enacted in enforcement of these purposes include, inter alia, the following powers and prohibitions: The Pennsylvania Liquor Control Board was given the *power* and *duty* to control the *manufac-*

*ture,* possession, sale, consumption, importation, *use and delivery* of liquor and alcohol in accordance with the provisions of the Act of July 18, 1935, (Pennsylvania Liquor Control Act) P. L. 1246, sec. 201(b). p. 1250.

It was declared unlawful for any person—with certain exemptions, not here material—, without a permit obtained (as provided in the Act) from the Pennsylvania Liquor Control Board to manufacture, produce, ...... *or transport for hire,* within this Commonwealth, any alcohol or alcoholic liquid. (Act of December 8, 1933, supra, sec. 3).

It was declared unlawful for any manufacturer or licensed importer of liquor in this Commonwealth to sell or offer to sell any liquor in this Commonwealth except to the Pennsylvania Liquor Control Board for use in the Pennsylvania Liquor Stores, or to the holder of a sacramental wine permit; but a manufacturer or licensed importer may sell, or offer to sell, liquor to persons outside of this Commonwealth. (Act of July 18, 1935, supra, sec. 601 (a), p. 1270).

All sales of alcoholic liquors, except as provided and permitted by the Act were forbidden; (Ibid. sec. 602 (a) ); and it was declared unlawful for any person, except a manufacturer, or the board, or the holder of a sacramental wine license or of an importer's license to possess within this Commonwealth any liquor which was not lawfully acquired prior to January 1, 1934 or had not been purchased from a Pennsylvania Liquor Store (Ibid. sec. 602 (b) ).

It was declared unlawful for a *manufacturer* to deliver any liquor *except in his own vehicles,* bearing his name and address on each side in letters not smaller than four inches, *or in the vehicle of another person duly authorized to transport liquor within this Commonwealth* (Act of July 18, 1935, supra, sec. 605).

Our Supreme Court, in a comprehensive and far-

reaching opinion by Chief Justice KEPHART *(Com. v. Stofcheck,* 322 Pa. 513, 185 A. 840, affirming the same case in this court, 118 Pa. Superior Ct. 412, 180 A. 84) sustained the constitutionality of the Pennsylvania Liquor Control Act—with special reference to section 602 (b) above—as enacted in the Special Session of 1933-34 (Act of November 29, 1933, P. L. 15, Special Session), and before the amendment of July 18, 1935, which enlarged the scope of the title, (see note 8, infra), and held that the word 'use' included within its meaning, 'keep' or 'possess', and thereby rendered unlawful any *possession* of alcoholic liquors contrary to the provisions of the Act. The Chief Justice said, inter alia [8], "The title of the act before us indicates two cognate legislative objects: first, to regulate and restrain the sale, [manufacture, possession, transportation,] importation, [traffic in,] and use of [alcohol and] alcoholic beverages and to impose penalties for practices or transactions prohibited by the regulations; second, to create as a means of carrying out and enforcing the regulatory provisions, the Pennsylvania Liquor Control Board and the State Store system. The title of the Act comprehends a complete system for liquor control within the Commonwealth."

In the course of an extended discussion of the police power of the State as respects, particularly, the enactment of legislation regulating the manufacture, sale and use of and the traffic in intoxicating liquors, and a review of the previous legislation in this State, enacted for its restraint and control, culminating in the present system which carries such regulation to a higher degree, the Chief Justice pointed out that "what the State can prohibit entirely, it can regulate"—citing *Eberle v. Michigan,* 232 U. S. 700; *Com. v. Vigliotti,* 271 Pa. 10, affirmed, *Vigliotti v. Penna.,* 258 U. S. 400—see also,

---

[8] The words in brackets are inserted to conform with the amendment of July 18, 1935, P. L. 1246, in force when this case arose.

*Seaboard Air Line Ry. Co. v. North Carolina,* supra, p. 304—and held that the provisions of the Pennsylvania Liquor Control Act, supra, were in accord with the police power of the State as it had been expressed in the decisions of the Supreme Court, and constituted a proper and effective use of that power, exercised, as stated in section 3 of the Act, "for the protection of the public welfare, health, peace, and morals of the people."

We come, then, to the application of these principles to the case at hand; and the facts call for its consideration under two heads: (1) The shipment of 39 cartons originating at the Finch distillery in this State; (2) the shipment of five cartons originating in Kentucky, but brought into this State and transhipped at Pittsburgh on its way to Baltimore, Maryland.

(1) The foregoing decisions leave no doubt that the Commonwealth of Pennsylvania has the power to prohibit the manufacture of alcoholic liquors within its borders. And this is so, even though such liquors are intended only for shipment out of the State; *Kidd v. Pearson,* 128 U. S. 1. The power to prohibit absolutely includes the power to prohibit conditionally, or to impose reasonable regulations or conditions on such manufacture; *Eberle v. Michigan,* 232 U. S. 700; *Com. v. Vigliotti,* 271 Pa. 10, 115 A. 20, affirmed, *Vigliotti v. Pennsylvania,* 258 U. S. 403; *Com. v. Stofcheck,* supra. "The greater power includes the less": *Seaboard Air Line Ry. v. North Carolina,* supra. It is common knowledge that the successful administration of statutes prohibiting or regulating the traffic in intoxicating liquors depends on the ability of the State to enforce them; and the State's success in enforcing such laws is in direct proportion to its ability to control the transportation and delivery of the liquors. The State will have comparatively little trouble in enforcing its statutes prohibiting the manufacture, sale and posses-

sion of illegal or bootleg liquors, if it can control their transportation and delivery; and the transportation and delivery by automobiles, motor trucks and motor vehicles constitute the greatest difficulty. This was recognized by the Supreme Court of the United States in *United States v. Simpson,* supra, where the opinion writer, Mr. Justice VAN DEVANTER said, speaking of the 'Reed Amendment,' supra; "Had Congress intended to confine it to transportation by railroads and other common carriers it well may be assumed that other words appropriate to the expression of that intention would have been used. And it also may be assumed that Congress foresaw that if the statute were thus confined *it would be so readily and extensively evaded by the use of automobiles, auto-trucks and other private vehicles that it would not be of much practical benefit"* (p. 467) (italics supplied).

Recognizing this, our system of regulation and control of intoxicating liquors was careful to provide that transportation for hire of alcoholic liquors within the Commonwealth shall be unlawful unless a permit authorizing the same is obtained from the Pennsylvania Liquor Control Board and bond given to obey the law and the conditions of the permit. But it does not stop there. It also provides that it is unlawful for a manufacturer of such liquors to deliver—that is, transport—them except in his own vehicles, duly marked, or in the vehicle of another duly authorized to transport them within this Commonwealth—that is, one holding a permit authorizing such transportation. In either event, the Commonwealth is protected by a bond insuring it against any use or delivery contrary to law. If the manufacturer uses his own vehicle, the bond he is required to give as a manufacturer covers any violation of law as respects the illegal delivery or use by him of such liquors; if he uses the vehicles of another, who is authorized to transport such liquors, the bond which

the permit holder is required to give likewise protects the Commonwealth against the illegal delivery, sale or use of such liquors while in transportation. Under our statutes liquor manufactured in this State does not become the subject of legal commerce or transportation, for delivery either without or within the State,— either interstate commerce or intrastate commerce— unless or until it is loaded for delivery on a vehicle authorized by law to transport and deliver it. Any delivery or transportation of such liquors, contrary to the laws of the Commonwealth, is a use in violation of the laws of this Commonwealth, *(Com. v. Stofcheck,* supra), and the Webb-Kenyon Law specifically deprives it of the immunity incident to a lawful use of such liquors in interstate commerce; *Clark Distilling Co. v. Western Md. Ry. Co.,* supra. While the Webb-Kenyon Law was primarily aimed at the importation of intoxicating liquors into a state, in violation of the laws of that state, it also includes in express terms, the interstate transportation of all liquor "in any manner used......in violation of any law of such state." We have no doubt of the State's power to condemn and forfeit both the liquors so unlawfully transported and the vehicle used in such unlawful transportation.

(2) The five cartons being transported from Louisville, Kentucky, to Baltimore, Maryland, by way of Pittsburgh, where it was transhipped and loaded on Stambaugh's truck are in a somewhat different situation.

The petition averred that the whiskey "was consigned from Brown Foreman Distillery Company in Louisville, Kentucky, to Puritan Beverage Co. in Baltimore, Maryland, and was shipped from Louisville, Kentucky, by way of Transcontinental Carriers, Inc., and transferred by them in Pittsburgh to a truck of your petitioner's for shipment to Baltimore, Maryland." As no answer was filed by the Commonwealth the facts averred

in the petition must be taken as true. There is nothing in the petition which warrants the finding or conclusion that anything was done—except as hereinafter stated—that took away from the shipment its character of interstate commerce—nothing which justifies a holding that the whiskey was kept at Pittsburgh for the use and profit of the owners, whereby it lost its character of interstate commerce and became subject to the police and taxing powers of the State, within the decisions in *General Oil Co. v. Crain,* 209 U. S. 211; *American Steel and Wire Co. v. Speed,* 192 U. S. 500. It is settled that where commodities are in fact destined from one state to another a mere rebilling or reshipment does not of itself break the continuity of the movement: *Carson Petroleum Co. v. Vial,* 279 U. S. 95, 103; *Western Oil Co. v. Lipscomb,* 244 U. S. 346, 349.

The Reed Amendment, prohibiting the transporting of liquor in interstate commerce "into" any State the laws of which prohibit its manufacture, etc. does not prohibit its transportation through such a state to another: *United States v. Gudger,* 249 U. S. 373.

There is nothing in the petition to show that this whiskey had come to "rest", as asserted by the Commonwealth. Consequently, our first impression was that these five cartons must be released. But on further consideration we have come to a different conclusion. In any event, their release and delivery to the petitioner would not affect the forfeiture and condemnation of the 39 cartons and the vehicle illegally transporting them.

As nothing to the contrary appears in the case we may take it for granted that Transcontinental Carriers, Inc. was legally authorized to transport these liquors from Louisville, Kentucky, to Pittsburgh, Pennsylvania. Had it continued their transportation from Pittsburgh, Pennsylvania, to Baltimore, Maryland—

without such detention at Pittsburgh, for the use and profit of the owners, as to subject it to the police power of this Commonwealth *(General Oil Co. v. Crain,* supra),—it would not have been in violation of any law of this Commonwealth and the whiskey would not have been subject to seizure, condemnation and forfeiture. But if Transcontinental Carriers, Inc. did not see fit itself to carry this whiskey from Pittsburgh to Baltimore, and, instead, transhipped it at Pittsburgh to another carrier, it was its duty to see that the carrier thus selected to complete the transportation and delivery was authorized by our law to transport and deliver the same. The reasonable regulation of a matter so vital to the successful administration of our system of Liquor Control, is within the power and authority of the State and a violation of such an important provision amounts to a use in violation of law. We are led to this conclusion by a number of very recent decisions of the Supreme Court of the United States. In *Morf v. Bingaman,* 298 U. S. 407, and *U. S. Fidelity & Guaranty Co. v. Bingaman,* 298 U. S. 407, the Supreme Court upheld a statute of the State of New Mexico which denies to all persons the use of the highways of the State for the transportation of any vehicle, on its own wheels, for the purpose of selling it or offering it for sale within or without the State, unless the vehicle is (1) licensed by the State, or is (2) owned by a licensed automobile dealer and operated under a dealer's license, or is (3) *operated under a special permit* issued by the State Commissioner of Revenue for its transportation. For such a permit the statute levies a fee of $7.50 if the vehicle is transported by its own power and a fee of $5.00 if it is towed or drawn by another vehicle. If such an interference with interstate commerce is justified as a reasonable regulation of the State's highways, in the interest of the

protection of the highways and the safety of traffic, we can see no reason for denying to this Commonwealth the right to regulate the transportation of intoxicating liquors, in the exercise of its police power and for the welfare and protection of its people, by a non-discriminatory law providing that it shall be unlawful to transport such liquors without a permit obtained from the Liquor Control Board—the control of the means of transportation being absolutely essential to the effective enforcement of our laws regulating such liquors.

So, too, in *Harford Acc. & Ind. Co. v. Illinois*, 298 U. S. 155, the court sustained a statute of the State of Illinois which forbids persons, corporations, etc. to receive, sell, offer, or solicit consignments of farm produce for sale, on commission, within Illinois, unless a license is obtained, a fee paid therefor, and a bond given in the sum of $5,000 conditioned against fraudulent conduct, etc. Mr. Justice ROBERTS, inter alia, said: "The sole question presented is the constitutional validity of the act as it affects the appellant's liability under its bonds. The statute is a police regulation. The business regulated is local, having its situs within the state and being conducted therein. The fact that the commission merchant contracts to sell, and sells, farm produce forwarded to him from points without, as well as points within, the state is not enough to condemn the regulation of a business carried on within her borders. Such effect as the regulation has upon interstate commerce is indirect and incidental and does not trespass upon the power conferred on Congress by Article I, section 8, of the Federal Constitution. In these circumstances, until Congress, under the commerce power, adopts inconsistent legislation, that of the state remains effective." Along similar lines, see *Hall v. Geiger-Jones Co.*, 242 U. S.

539, 557, 558, which upheld a statute of the State of Ohio requiring a license to sell or offer to sell, within the State, stock, bonds, etc.; *Smith v. Alabama,* 124 U. S. 465, and *Nashville, Chattanooga & St. L. Ry. Co. v. Alabama,* 128 U. S. 96, which sustained a statute requiring the examination and licensing of locomotive engineers; *Hennington v. Georgia,* 163 U. S. 299, where a statute forbidding the running of freight trains on Sunday was held valid; *Sligh v. Kirkwood,* 237 U. S. 52, 60, 61, where a statute forbidding the delivery for shipment in interstate commerce of citrus fruits, when unripe and unfit for consumption, was sustained; *Chicago, R. I. & P. Ry. v. Arkansas,* 219 U. S. 453, where the 'full crew' law of Arkansas was held constitutional.

In *Bayside Fish Flour Co. v. Gentry,* 297 U. S. 422, opinion by Mr. Justice SUTHERLAND, filed March 2, 1936, a suit brought to enjoin officers of the State of California from enforcing certain provisions of the State Fish & Game Code alleged to contravene the commerce clause and the due process and equal protection clauses of the Fourteenth amendment, of the Federal Constitution, the court said: "If the enforcement of the act affects interstate or foreign commerce, that result is purely incidental, indirect, and beyond the purposes of the legislation. The provisions of the act assailed are well within the police power of the state, as frequently decided by this and other courts."

We are of opinion, that this Commonwealth, in adopting and promulgating its system for the regulation, restraint and control of intoxicating liquors, in the exercise of its police power, had the right and authority to provide that it should be unlawful for any one to transport intoxicating liquors within this State without a permit from the Pennsylvania Liquor Control Board,[9] provided the regulation adopted is reason-

---

[9] Section 4 of the Act of December 8, 1933, supra, provides for the registry of *federal permits* with the board.

able and non-discriminatory and is reasonably calculated to effect the purpose in view, viz., the prevention of the unlawful traffic in intoxicating liquors; and that when Transcontinental Carriers, Inc., which transported this whiskey from Louisville, Kentucky, to Pittsburgh, Pennsylvania, arranged for its further transportation from Pittsburgh, Pennsylvania, to Baltimore, Maryland, and its delivery there by a carrier for hire, it was incumbent upon it, or the owner,—if it made the arrangements—to see that the carrier so employed was authorized under the laws of Pennsylvania to transport and deliver said whiskey by the possession of a legal permit, and that any attempted transportation and delivery contrary to the law of Pennsylvania was a use in violation of law, which made the Webb-Kenyon Law applicable and rendered the whiskey subject to condemnation and forfeiture.

Any other construction would so hamper, or even hamstring, the effective administration of our laws regulating and restraining the manufacture, sale, use, possession and transportation of intoxicating liquors as to make their successful enforcement problematical, if not impossible.

The orders are reversed and the record is remitted to the court below with directions to dismiss the petition, to the end that the condemnation and forfeiture of the seized liquors and motor truck may be proceeded with according to law.

Costs to be paid by the appellees, respectively.